294 N.J. Super. 53 (1996)
682 A.2d 724
PETER LEWIS, PLAINTIFF-APPELLANT,
v.
AMERICAN CYANAMID COMPANY, REALEX CHEMICAL CORPORATION, AND CHEMSICO INCORPORATED, DEFENDANTS-RESPONDENTS.[1]
Superior Court of New Jersey, Appellate Division.
Argued June 12, 1996.
Decided September 26, 1996.
*56 Before Judges LONG, MUIR, Jr., and BROCHIN.
James M. Burke argued the cause for appellant (Mackevich, Burke & Stanicki, attorneys; Mr. Burke, on the brief).
Anthony J. Marchetta argued the cause for respondent American Cyanamid Company (Pitney, Hardin, Kipp & Szuch, attorneys; Mr. Marchetta, Kathryn M. Decker, and Suzanne M. Sofer, on the brief).
Robert A. Assuncao argued the cause for respondent United Industries Corp. (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Mr. Assuncao, on the brief).
The opinion of the court was delivered by BROCHIN, J.A.D.
Plaintiff Peter Lewis was very badly burned over 25 percent of his body when the flame from the pilot light of a gas oven or a spark from a refrigerator motor ignited the gaseous hydrocarbon *57 propellants that were released into the air by his use of two cans of defendants' aerosol insecticide, Combat Room Fogger. Plaintiff instituted this products liability action for damages against the manufacturer, defendant United Industries Corporation, and the distributor, defendant American Cyanamid Company. He claims that his injuries were caused by the defective design, manufacturing and labeling of the product.
The defective labeling claim was dismissed before trial on the ground that it was preempted by FIFRA, the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C.A. §§ 136a  136y. Only the claims of defective design and manufacturing were submitted to the jury.
The trial judge summarized the facts of the case in a written opinion which he prepared after the verdict to explain his decision of several post-trial motions. His factual summary conforms in all material respects to our understanding of the record. It describes the facts as follows:
United Industries manufactured a room fogger known as "Combat" which was marketed to kill roaches and fleas. The package in which the Combat canisters were sold contained the following warning:
1. Cover exposed food, dishes and food handling equipment. Open cabinets and doors to areas to be treated. Shut off fans and air conditioners. Put out all flames and pilot lights. Close doors and windows.
2. Tilt top of can away from face. Press valve all the way down, hooking the catch.
3. Then place fogger on stand, table or floor in center of room with the valve locked open, with several layers of newspaper or pad under fogger. Leave treated area for 2 hours.
4. After 2 hours, open all doors and windows, turn on air conditioners and fans and let the treated area air for 30 minutes.
On July 4, 1989 the plaintiff, Peter Lewis, made use of the fogger. The manner in which he did so comes from his testimony and is not in dispute. He bought a box containing three Combat six-ounce cans of fogger. He had a roach problem in the kitchen. He put one can of fogger underneath a counter and another can underneath a range. He then activated both cans and left the room. After he left the room he observed that foam was dripping down the can which he had placed underneath the counter and he entered the room in order to correct the operation of that fogger by manipulating the valve through which the effluent was released. He did so and then, for some reason not important in this decision, a can burst into flames and he was severely burned over about twenty-five percent of his body.

*58 ....
Aside from the question whether the fogger which was foaming was defectively manufactured, the primary issue at trial was whether the propellant used in the manufacture was an appropriate one. The fogger contained a water-based solution with a flammable hydrocarbon propellant. Wilbur Boyer, plaintiff's expert witness on the subject, testified that the use of a flammable propellant was a design defect because a non-flammable propellant known as dymel, or P-22, was available.
Montford Johnsen, testifying on behalf of defendant, stated that in the early 1980s it was known that P-22 could cause birth defects and also that it was an ozone depleter. He testified also that if P-22 were used, the pressure in the can would have to be sixty percent higher than with the hydrocarbon which actually was used, in which case the can would be in great danger of exploding. However, on cross-examination he testified also that he had been told by a chemist from DuPont, the producer of P-22, that it was not dangerous. There also was evidence that P-22 was used in the 1980s as a propellant for other devices.
....
In plain terms, the problem which the jury faced was whether, in order to protect against foreseeable misuse, the manufacturer should have employed the non-flammable propellant instead of the propellant which was used. The only non-flammable propellant suggested was P-22 which, even in the 1980s, was considered by a significant portion of those manufacturing such devices to carry a danger of causing birth defects and depleting the ozone layer. That these considerations were substantial was borne out by the fact that at the time of trial, P-22 was prohibited for all uses because of these dangers.[2]
We supplement this statement by mentioning two additional facts which are pertinent to our opinion. First of all, plaintiff claimed that he had extinguished all the pilot lights in his kitchen before he activated the two cans of Combat Room Fogger. However, there was evidence that he had failed to extinguish an oven pilot light, and the jury could have found that that was the source of the flame which ignited the propellant gases. Secondly, the label also contained the following warnings:
Do not use or store near heat or open flame. Do not puncture or incinerate container. Exposure to temperatures above 130 degrees F. may cause bursting..... Store in cool dry area away from heat or open flame.
The jury returned its verdict by answers to special interrogatories. It found that there was no manufacturing defect. It answered *59 "No" to the question whether "the product, as designed, [had] a design defect." It answered "Yes" to the question whether plaintiff "misuse[d] the product ... or use[d] it in a way that was not reasonably foreseeable," but it found that "the misuse [was] objectively foreseeable to the manufacturer" and that, taking that finding into consideration, the design of the product was defective and the design defect was a proximate cause of the accident. Next, the jury determined that "the plaintiff voluntarily and unreasonably proceed[ed] to encounter a known danger in the manner in which he used the Combat Room Fogger" and that his "voluntary and unreasonable encountering of a known danger [was] a proximate cause of the accident." The jury apportioned 50 percent of the total fault to plaintiff and 25 percent to each of the two defendants. It assessed total damages at $275,000.
The trial judge interpreted the jury's verdict to mean that "the manufacturer should have taken measures in light of the possible foreseeable misuse of the product to so construct the fogger that, even with such misuse, it would not be flammable. The jury's verdict made it clear that under normal use conditions it did not consider the fogger unsafe." The arguments presented on appeal indicate that all of the parties concur in this interpretation of the verdict.
Following the verdict, plaintiff moved for additur or, alternatively, for a new trial on damages only and defendants moved for judgment notwithstanding the verdict. The trial judge ruled, first of all, that because "there was sufficient evidence of the reality" of the "ultimately-proven risks" of using P-22 as an aerosol propellant, i.e., that it would cause birth defects and deplete the stratospheric ozone layer, the court rather than the jury should make the "policy decision" whether "the manufacturer nevertheless was required to incur these risks rather than the risk of using a flammable propellant." The court decided that there was "a substantial, real and not imaginary risk in using the alternative"; that a manufacturer cannot be required to incur that risk; and, quoting N.J.S.A. 2A:58C-3a(1), that Combat Room Fogger was *60 not defectively designed because there was no "`practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product.'" See Cepeda v. Cumberland Eng'g Co., 76 N.J. 152, 386 A.2d 816 (1978), overruled on other grounds by Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 177, 406 A.2d 140 (1979). The trial judge also ruled, as a pretrial judge had done, that plaintiff's claim based on defective labeling was preempted by FIFRA, that the label must therefore be deemed adequate, and that the manufacturer and distributor were entitled to rely on a presumption that a user of the product would heed the label warnings. Since the accident would not have occurred if plaintiff had conformed his conduct to those warnings by placing the aerosol can in an unobstructed location in the center of the room, leaving the room immediately after initiating the discharge of its contents, and remaining out of the room for two hours afterwards, the judge held that the defective design of Combat Room Fogger was not the proximate cause of plaintiff's injuries. He therefore denied plaintiff's motion for additur or, alternatively, for a new trial on damages, and he granted defendants' motions for judgment notwithstanding the verdict.
On appeal, plaintiff argues:
Point I. The entry of judgment NOV should be reversed since the court erred in holding that the only proximate cause of the accident was the manner in which the plaintiff used the product.
Point II. The court erred in entering judgment NOV by weighing the evidence and making inaccurate findings of fact in violation of the judgment NOV standard, and by applying an incorrect legal standard to plaintiff's alternative design.
Point III. The court erred in denying the plaintiff's motion to strike the comparative negligence defense, and in charging the jury on the issue of comparative negligence.
Point IV. The plaintiff is entitled to a new trial on damages because of the court's failure to adequately instruct the jury.
Point V. Because FIFRA does not preempt plaintiff's failure to warn and fraud claims, the partial summary judgment and order dismissing these claims should be reversed.
We deal first with the question whether the Law Division was correct in holding that plaintiff's claims based on the alleged *61 inadequacy of the Combat Room Fogger label are preempted by a provision of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C.A. § 136v. That provision reads as follows:
(a) A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.
(b) Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.
All parties agree that the label on the Combat Room Fogger is subject to FIFRA and has been approved by the Federal Environmental Protection Agency (EPA). The trial judge and a Law Division motion judge concluded that the decision of the United States Supreme Court in Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), required them to hold that FIFRA prohibits New Jersey from imposing a damage remedy, whether by decisional or statutory law, based on any alleged defect in any pesticide label approved by the EPA.
The statutory provisions at issue in Cipollone were sections 4 and 5 of the Federal Cigarette Labeling and Advertising Act of 1965 and the Public Health Smoking Act of 1969, 15 U.S.C.A. §§ 1331-1340. Section 5 of the 1965 Act, captioned "Preemption," stated:
(a) No statement relating to smoking and health, other than the statement required by section 4 of this Act, shall be required on any cigarette package.
(b) No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.
The "statement required by section 4" was, "Caution: Cigarette Smoking May Be Hazardous to Your Health." Cipollone, supra, 505 U.S. at 514, 112 S.Ct. at 2616, 120 L.Ed.2d at 421. The 1969 Act changed the warning statement from "Cigarette Smoking may be hazardous...." to "Cigarette Smoking is Dangerous.... and amended paragraph (b) of section 5 to read:
(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.
*62 The members of the Cipollone Court differed on whether state damage claims other than those based on alleged failure to warn were preempted, but all of the Justices agreed that the express language of both the 1965 and the 1969 Acts manifested a clear Congressional intent to preempt common law claims based on alleged inadequacies of cigarette package labels. Cipollone declares:
The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules. As we noted in another context, "[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." San Diego Building Trades Council v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773 [780], 3 L.Ed.2d 775 (1959).
[505 U.S. at 521, 112 S.Ct. at 2620, 120 L.Ed.2d at 426.]
In Macrie v. SDS Biotech Corp., 267 N.J. Super. 34, 44-49, 630 A.2d 805 (App.Div.), certif. denied, 134 N.J. 565, 636 A.2d 522 (1993), we relied on Cipollone and the many cases which follow it as the basis for recognizing that FIFRA would preempt a damage action under New Jersey law based on the alleged inadequacy of a pesticide label. Macrie was a products liability case. Defendant was the manufacturer of a pesticide used for treating crops. Plaintiffs claimed that the defendant's failure to warn them of the danger of its fungicide residue remaining on treated vegetables was a proximate cause of their injury. We recognized that plaintiffs' claim would be preempted if it was based on a contention that defendant's federally approved label was inadequate. However, we held that the action was not preempted because it was based, not upon any flaw in the language of the labels or packaging approved by the EPA, but upon the defendant's failure to take adequate steps to assure that brochures or other warnings in the form approved by the EPA reached indirect users of the product. We said in a footnote, "Subsequent to Cipollone, most courts considering the issue hold that FIFRA preempted state common law claims." Id. at 46 n. 4, 630 A.2d 805. The authorities supporting that proposition include Taylor AG Industries v. Pure-Gro, 54 F.3d 555 (9th Cir.1995); Lowe v. Sporicidin International, *63 47 F.3d 124 (4th Cir.1995) (citing Worm v. American Cyanamid Co., 5 F.3d 744 (4th Cir.1993)); Bice v. Leslie's Poolmart, Inc., 39 F.3d 887 (8th Cir.1994); MacDonald v. Monsanto Co., 27 F.3d 1021 (5th Cir.1994); King v. E.I. Dupont De Nemours & Co., 996 F.2d 1346 (1st Cir.), cert. dismissed, 510 U.S. 985, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993); Papas v. Upjohn Co., 985 F.2d 516 (11th Cir.), cert. denied, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); Arkansas-Platte & Gulf Partnership v. Van Waters & Rogers, Inc., 981 F.2d 1177 (10th Cir.), cert. denied, 510 U.S. 813, 114 S.Ct. 60, 126 L.Ed.2d 30 (1993); Hochberg v. Zoecon Corp., 421 Mass. 456, 657 N.E.2d 1263, 1266 (1995). See also Beverly L. Jacklin, Annotation, Federal Pre-emption of State Common-Law Products Liability Claims Pertaining to Pesticides, 101 A.L.R. Fed. 887 (1991) (listing and discussing cases on the general topic of FIFRA's preemption of state common-law claims affecting product labeling). The Law Division's preemption ruling in the present case is consistent with these authorities and with the United States Supreme Court's decision in Cipollone, on which Macrie relied.
After the argument of the present case before our court, the United States Supreme Court decided Medtronic, Inc. v. Lohr, ___ U.S. ___, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). That case held that a strict-liability damage claim under Florida law based on the allegedly defective manufacture, design and labeling of a cardiac pacemaker was not preempted by the 1976 Medical Devices Amendments to the Federal Food, Drug, and Cosmetic Act (MDA), now codified as amended at 21 U.S.C.A. §§ 360c-360k, 379 and 379a. Because of Medtronic's possible pertinence to the preemption issue in this case, we invited and received supplemental briefs. We have carefully considered the able arguments presented to us. For the following reasons, we conclude that the holding of the plurality opinion in Medtronic is not inconsistent with Cipollone, and we hold that the Law Division's ruling that plaintiff's claims based on inadequate labeling are preempted by FIFRA remains an accurate statement of the applicable law.
*64 Cipollone and Medtronic are both based on the premise that "`The purpose of Congress is the ultimate touchstone of' preemption analysis." Cipollone, supra, 505 U.S. at 516, 112 S.Ct. at 2617, 120 L.Ed.2d at 422 and Medtronic, supra, ___ U.S. at ___, 116 S.Ct. at 2250, 135 L.Ed.2d at 715-16 (quoting Retail Clerks v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963)). The two cases reach different results because the Court concluded that the legislative intent reflected in the legislation at issue in Cipollone was different from that reflected in the legislation which was the subject of Medtronic.
The preemption provision of MDA, the statute at issue in Medtronic, reads as follows:
State and local requirements respecting devices
(a) General rule
Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement 
(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.
[21 U.S.C.A. § 360k].
(In a footnote, the Court explained that subsection (b) of § 360k "authorizes the FDA to grant exemptions to state requirements that would otherwise be pre-empted by subsection (a)." Medtronic, supra, ___ U.S. at ___ n. 5, 116 S.Ct. at 2249 n. 5, 135 L.Ed.2d at 713-14 n. 5.)
MDA requires agency approval for labels on a device intended "for a use which is of substantial importance in preventing impairment of human health or ... presents a potential unreasonable risk of illness or injury." 21 U.S.C.A. § 360c(a)(1)(C). The statute also prohibits misleading or fraudulent labeling, 21 U.S.C.A. §§ 360e(d)(2)(D), 360e(e)(1)(F), and the Court refers to implementing regulations "which require manufacturers of every medical device, with a few limited exceptions, to include with the device a label containing `information for use, ... and any relevant hazards, contraindications, side effects, and precautions.'" Medtronic, *65 supra, ___ U.S. at ___, 116 S.Ct. at 2256, 135 L.Ed.2d at 723 (citing 21 C.F.R. §§ 801.109(b) and (c) (1995)). However, unlike the statutes considered in Cipollone, the Medtronic statute and its implementing regulations do not prescribe any specific language for labels and its preemption provision does not contain any express statement of an intent to preempt state labeling requirements.
Construing MDA, Medtronic explained in the following terms why plaintiff Lohr's failure to warn claim is not preempted:
[T]he predicate for the failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use. These general obligations are no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a workforce. These state requirements therefore escape pre-emption, not because the source of the duty is a judge-made common-law rule, but rather because their generality leaves them outside the category of requirements that § 360k envisioned to be "with respect to" specific devices such as pacemakers.
[Id. at ___, 116 S.Ct. at 2258, 135 L.Ed.2d at 725-26].
Medtronic suggests another reason for its holding which may be the most important reason. Under the regulatory system established by MDA, the great majority of the medical devices in the category whose proper functioning is potentially the most critical for the user's life and well-being has not received more than a brief, superficial review before marketing. MDA contains a "grandfathering" provision which allows the continued marketing of devices which were offered for sale before 1976 and, to avoid giving those devices a monopoly, the statute also permits new devices that are "substantially equivalent" to preexisting devices to avoid the Federal Drug Administration's rigorous premarket approval process. According to a 1990 House of Representatives Report, 80 percent of new medical devices were being marketed with only minimal review because they are "substantially equivalent" to preexisting devices. The pacemaker which was the allegedly defective device at issue had been introduced under the substantial equivalency procedure without a rigorous agency review. Id. at ___-___, 116 S.Ct. at 2247-48, 135 L.Ed.2d at 712.
*66 It is against this regulatory background that the Court rejected the manufacturer's argument that "the plain language of the statute pre-empts any and all common-law claims brought by an injured plaintiff against a manufacturer of medical devices." Id. at ___, 116 S.Ct. at 2251, 135 L.Ed.2d at 716. The Court wrote:
Medtronic's argument is not only unpersuasive, it is implausible. Under Medtronic's view of the statute, Congress effectively precluded state courts from affording state consumers any protection from injuries resulting from a defective medical device. .. . Medtronic's construction of § 360k would therefore have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order "to provide for the safety and effectiveness of medical devices intended for human use," 90 Stat. 539 (preamble to Act).
[Id., ___ U.S. at ___-___, 116 S.Ct. at 2251, 135 L.Ed.2d at 716-17.]
The driving force of the opinion appears to be the plurality's determination not to infer that Congress intended to have whatever consumer protection might be afforded by common-law tort actions preempted in favor of a regulatory scheme that was largely toothless because of the MDA's "grandfathering" and "substantially equivalent" provisions. Significantly, Medtronic expressly distinguishes Cipollone on the ground that, although Cipollone holds that state law claims based on allegedly inadequate labeling are preempted, Cipollone also holds that other strict liability causes of action remain viable.
Like the preemption clause at issue in Cipollone and unlike that in Medtronic, the preemption provision of FIFRA is precise and explicit; i.e., a State "shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." Furthermore, FIFRA, like the Cipollone statutes, leaves unconstrained all state common law causes of action for defective products except those based on inadequate labels. Finally, FIFRA has no escape clauses like the "grandfathering" and "substantially equivalent" provisions of MDA. The statute and regulations provide that substantially all pesticides are subject to extensive review by the EPA, and the EPA prescribes precise content for pesticide labels, including disclosures of flammability. See 40 C.F.R. § 156.10.
*67 The only colorable argument against preemption of claims based on inadequate labeling which is not disposed of by the statutory language of FIFRA is the argument that "requirements" was not intended to encompass duties imposed by state common law. Cipollone rejected that argument for the legislation with which it was concerned. Significantly for the present case, Medtronic lends the argument no support. The plurality opinion, concurred in by four justices, noted, as we have mentioned, that "the general state common-law requirements in this case .... escape pre-emption, not because the source of the duty is a judge-made common-law rule, but rather because their generality leaves them outside the category of requirements that § 360k [the preemption provision] envisioned to be `with respect to' specific devices such as pacemakers." Medtronic, supra, ___ U.S. at ___, 116 S.Ct. at 2258, 135 L.Ed.2d at 725-26. The remaining five justices, concurring and concurring in part and dissenting in part in two separate opinions, all stated emphatically that the term "requirements" in MDA does encompass judge-made law developed in a state common law tort suit. Justice Breyer made the point as follows in his concurring opinion:
Imagine that, in respect to a particular hearing aid component, a federal MDA regulation requires a 2-inch wire, but a state agency regulation requires a 1-inch wire. If the federal law, embodied in the "2-inch" MDA regulation, pre-empts the state "1-inch" agency regulation, why would it not similarly pre-empt a state law tort action that premises liability upon the defendant manufacturer's failure to use a 1-inch wire (say, an award by a jury persuaded by expert testimony that use of a more than 1-inch wire is negligent)? The effects of the state agency regulation and the state tort suit are identical.
[Id. at ___, 116 S.Ct. at 2259, 135 L.Ed.2d at 727 (Breyer, J., concurring in part and concurring in the judgment)].
Similarly, in the present case, since FIFRA would preempt a state statute or regulation which imposes a monetary penalty on a manufacturer for not using a pesticide label different from that approved by the EPA, FIFRA also preempts a common law rule that would subject a manufacturer to a damage judgment for the same adherence to federal rather than state law. We therefore agree with the Law Division's rejection of plaintiff's failure to warn claim.
*68 In an argument related to plaintiff's failure to warn argument, he also contends that he should be free to show that the defendant manufacturer of Combat Room Fogger avoided its obligation to label its product as flammable by submitting misleading data to the EPA which resulted from improperly conducted flammability tests. To permit a plaintiff to litigate that cause of action would require a state court to determine the factual basis for the determination made by the EPA and, if that factual basis was erroneous, to decide what the true facts are and how they would affect the EPA's approval of the defendant manufacturer's label. Such an inquiry would constitute a collateral attack in a state court on a federal agency's final decision. We conclude that the Law Division rightly determined that that inquiry could not properly be pursued in this action. Cf. Michael v. Shiley, Inc., 46 F.3d 1316, 1329 (3d Cir.), cert. denied, ___ U.S. ___, 116 S.Ct. 67, 133 L.Ed.2d 29 (1995) (pre-empting claim for fraud on the FDA and finding no authority for state inquiry into FDA factual determinations and conclusions).
We turn now to the question whether the trial court erred in its ruling that plaintiff's conduct in disregard of the warnings on the Combat Room Fogger label was the sole proximate cause of his injury and, on that ground, a bar to his claim. Defendants admitted and the jury found that plaintiff's misuse of the product was objectively foreseeable by the manufacturer. The jury also found that the design of the product was defective in the light of that objectively foreseeable misuse. Our Supreme Court has held that a product is defectively designed if it is not designed to be as safe as reasonably feasible under conditions of foreseeable misuse. Jurado v. Western Gear Works, 131 N.J. 375, 385, 619 A.2d 1312 (1993); Brown v. United States Stove Co., 98 N.J. 155, 168-69, 484 A.2d 1234 (1984). If there is an objectively foreseeable likelihood that a product will be subject to misuse and that that misuse will endanger users despite appropriate warnings, then warnings alone will not satisfy the manufacturer's duty. In addition to providing warnings, the manufacturer must also take all other feasible *69 measures required by a risk-utility analysis to make even anticipated misusers of the product reasonably safe. The trial court's ruling in the present case disregards that principle. Instead, the ruling implies that a manufacturer's warnings against foreseeable misuse immunize the manufacturer from responsibility for injuries whose proximate cause is the manufacturer's failure to take other reasonable steps to make the product safe. That is not our law. Jurado, supra; Brown, supra.
We also disagree with the trial court's ruling that, as a matter of law, the manufacturer of Combat Room Fogger was justified in refusing to use P-22 as its aerosol propellant. For plaintiff to sustain his burden of proving that the product was flawed by a design defect, he had to show that P-22 could practically and feasibly have been added to or substituted for the mixture of isobutane and propane gases actually utilized, and that the addition or substitution would have made the product safer. See William A. Dreier, et al., New Jersey Products Liability and Toxic Torts Law § 5:2 at 28 (1996)("[A] design defect is ... a danger inherent in a product, which has been manufactured as intended, when that danger, as a public policy matter, is greater than can be justified by the product's utility.") (citing Jurado v. Western Gear Works, 131 N.J. 375, 385, 619 A.2d 1312 (1993); Johansen v. Makita U.S.A., Inc., 128 N.J. 86, 95, 607 A.2d 637 (1992); Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 406 A.2d 140 (1979); Cepeda v. Cumberland Eng'g Co., 76 N.J. 152, 173, 386 A.2d 816 (1978)); see also Smith v. Keller Ladder Co., 275 N.J. Super. 280, 284, 645 A.2d 1269 (App.Div. 1994) (citing Restatement (Third) of Torts § 2(b) cmt. d at 20). If plaintiff introduced evidence tending to show that a useable alternative propellant existed at the time of trial, defendants were entitled, pursuant to N.J.S.A. 2A:58C-3, to dispute that evidence by proving that:

At the time the product left the control of the manufacturer, there was not a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product.
[N.J.S.A. 2A:58C-3a(1) (emphasis added).]
*70 See Roberts v. Rich Foods, Inc., 139 N.J. 365, 654 A.2d 1365 (1995) (noting that under "state of the art" defense of N.J.S.A. 2A:58C-3(a)(1), defendant has burden of proving product was state of the art at the time of manufacture); Fabian v. Minster Mach. Co., 258 N.J. Super. 261, 609 A.2d 487 (App.Div.) (same), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992); William A. Dreier, supra, § 14:2 at 301-05 (same). Unless the evidence presented at trial was such that a reasonable jury could rationally have reached only one conclusion on the feasibility of utilizing a safer alternative propellant for Combat Room Fogger, the jury was the fact-finder entitled to determine whether either plaintiff or defendants had sustained their burden of proof with respect to that issue. O'Brien v. Muskin Corp., 94 N.J. 169, 186-87, 463 A.2d 298 (1983) (stating that if reasonable minds could not differ on "whether the risk posed by a product outweigh its utility, or vice versa," then the court can decide the issue as a matter of law); Cf. Feldman v. Lederle Lab., 257 N.J. Super. 163, 171-72, 608 A.2d 356 (App.Div. 1992), aff'd as modified on other grounds, 132 N.J. 339, 625 A.2d 1066 (1993) (holding that plaintiff in a failure to warn case has the burden of proving that defendant did not act reasonably in light of facts known at the time the product was manufactured).
Consequently, whether or not the design of Combat Room Fogger was defective was a jury question unless there was virtually indisputable evidence that information available in 1988 or 1989 showed that use of P-22 was not practical or technically feasible because it tended to deplete the stratospheric ozone layer and caused harmful birth defects, and that these consequences of its use would clearly outweigh the benefits of making the product available with reduced flammability. In our view, the evidence presented at trial on these issues was sparse and did not prove with the requisite certainty that in 1988 and 1989 the deleterious effects of P-22 were believed to be so probable and of such magnitude that its use as an aerosol propellant would have been unreasonable. The trial court should therefore not have entered *71 judgment notwithstanding the verdict on the ground that Combat Room Fogger was not defective.
Defendants also argue that the judgment was proper on another ground which was not expressly considered by the trial court. They contend that even if there was sufficient evidence for the jury to find that their product was defective, the evidence was insufficient to prove that the defect  the failure to reduce flammability by using P-22 in the propellant mixture  was a proximate cause of plaintiff's injury. Cf. Brown v. United States Stove Co., 98 N.J. 155, 171-175, 484 A.2d 1234 (1984) (holding manufacturer of a defectively designed product liable where the design defect was not a proximate cause of the injury). An explanation of defendants' argument and of the reasons why we reject it requires us to summarize the relevant evidence.
Plaintiff presented his evidence of a technically feasible alternative design for Combat Room Fogger through Mr. Wilbur Boyer, his expert witness. Mr. Boyer initially testified that there was a product known as P-22 (chlorodifluoromethane), marketed by DuPont as Dymel 22, which would have been an available, non-flammable substitute for the flammable propellant which defendants were actually using. Still on direct examination, he then qualified that testimony by explaining that P-22 could not be used as the sole propellant. It would, he stated, "simply [be] used as an addition to the hydrocarbon propellant to make that non-flammable...." Despite this qualification, he stated categorically that if P-22 had been put into Combat Room Fogger, the fire which caused plaintiff's injuries would not have occurred.
According to Mr. Boyer, neither the gases actually used in Combat Room Fogger nor the proposed alternative mixture of propane, isobutane and P-22 will ignite unless there is a sufficient proportion of air present. On direct examination, Mr. Boyer testified that isobutane, propane and air would ignite if air constituted at least two percent of the mixture, and that isobutane, propane and P-22, in the proportions which he suggested should have been used as the propellant, would ignite only if mixed with *72 air so that air constituted at least 6 percent of the mixture. That was obviously a misstatement. Taken literally, it meant that the isobutane-propane mixture would not ignite unless it constituted at least 98 percent, and that a mixture of isobutane, propane, and P-22 would not ignite unless it constituted at least 94 percent, of the volume of gases in a room or other relevant space.
Mr. Boyer corrected these misstatements during cross-examination. Referring to the Dupont literature that provided the data on which he relied, he testified that the gases which defendants were using as a propellant would be flammable if they constituted approximately 2 percent of the atmosphere and that those gases mixed with P-22 as he recommended would be flammable if the mixture constituted approximately 6 percent of the atmosphere. He also conceded that the DuPont literature on which he relied, which described P-22 as non-flammable when used alone, stated that when P-22 was blended with hydrocarbons, as he agreed it would have to be for use as an aerosol propellant, it was classified as flammable and should be handled in explosion-proof equipment.
If Mr. Boyer's testimony is accepted at correct, its import is that if the P-22 mixture had been used as a propellant in the manner suggested by Mr. Boyer, the propellant gases would not have ignited until their concentration reached at least 6 percent of the atmosphere in the space between plaintiff and the source of ignition. Mr. Boyer admitted that he did not know, and did not make any calculations or conduct any experiments to ascertain, what concentration of gas had collected in plaintiff's kitchen when the gas suddenly caught fire. Defendants contend that without such evidence, there was no way for the jury to find that if the P-22 mixture had been used, it probably would not have caught fire while plaintiff was in the room.
We disagree. If the jury believed, as it would have been justified in doing, that the ignition was caused by a pilot light, the jury could have inferred that the gases caught fire as soon as they reached a concentration of approximately 2 percent in some part of the room in proximity to that source of ignition. Mr. Boyer *73 testified that the contents of a Combat Room Fogger can would be exhausted within approximately two minutes after it was activated. From plaintiff's description of his actions, the jury could readily have found that almost two minutes must have elapsed between his activating the fogger and his encountering the ball of fire. In other words, when the fire ball struck, the contents of the cans were probably substantially exhausted. The jury could have inferred from these facts that if the cans had been filled with the P-22 mixture, even at a higher pressure than the propellant actually used, the cans would probably have been emptied before the concentration of propellant gases in the relevant part of the atmosphere of the room had reached the 6-percent level that would have been required for ignition, and, consequently, if P-22 had been used, the fire would probably not have occurred and plaintiff would not have been burned. The trial court's entry of a judgment notwithstanding the verdict therefore cannot be sustained on the ground that plaintiff failed to prove that if the P-22 mixture had been used, he would probably not have been injured.
This conclusion requires us to consider plaintiff's challenges to the trial court's charge on damages and on comparative negligence. He contends that the trial court erred in submitting the issue of comparative negligence to the jury because there was no evidence that plaintiff knew the gaseous propellant in Combat Room Fogger was flammable. Alternatively, he asserts that if the jury was properly permitted to pass on his comparative negligence, it should have been instructed that defendants were not entitled to prevail on that issue unless it found that he had intentionally disregarded the instructions on the Combat Room Fogger label while cognizant that doing so would expose him to the danger of being burned. He also argues that the charge on damages was deficient because it did not explain the elements of plaintiff's damage claim with sufficient specificity and that this omission resulted in an inadequate award. We will deal first with whether plaintiff's negligence should have been submitted to the jury and, if so, under what legal rule.
*74 Over plaintiff's objection, the trial judge ruled that he would charge the jury that for plaintiff to be found comparatively negligent, "defendant must prove that the plaintiff had actual knowledge that he was taking a risk and knowingly and voluntarily encountered that risk to win on this defense." He declined to charge that in order for defendants to prevail on the issue of comparative negligence, they had to show that plaintiff was aware of the specific risk which he in fact encountered. In other words, the court decided that the defense of comparative negligence would be applicable if plaintiff knew that "he was taking a risk," even if he did not have actual knowledge of the danger of injury from fire.
The court's initial instruction to the jury was ambiguous on the question whether defendants could prevail on the defense of comparative negligence without plaintiff's having been aware that he was running the risk of being burned as the result of his disregarding the instructions on the Combat Room Fogger label. However, during deliberations, the jury asked the following question about the interrogatory on its verdict sheet dealing with comparative negligence:
[O]n this question, does the term `known danger' specifically refer to [plaintiff's] knowing that he might be burned by misusing the product.
The judge replied:
[T]he answer to that is, it does not.
The question was carefully worded, it was carefully worded and it reads, "Did the plaintiff voluntarily and unreasonably proceed to encounter a known danger," any danger at all, "in the manner in which he used the Combat room fogger." And the reason for that is that the warnings on the label are taken as a given. They're not  they cannot be contested. If you conclude that in using that fogger in violation of the warnings on the label that constituted a voluntary and unreasonable encounter with a known danger, you answer that question yes. If you conclude that he did not, you answer it no. That's the way it is. It does not have to be the specific thing which occurred to him....
The jury found that plaintiff was 50 percent negligent. The evidence would have permitted a finding that plaintiff was aware that use of defendants' products posed some risk, but that he did not know that it was flammable. We must therefore decide whether the trial court was correct in charging the jury that it *75 could properly find that plaintiff was comparatively negligent even if it found he did not know that, by disregarding the label instructions, he was courting the specific danger of being burned.
In Cepeda v. Cumberland Engineering Company, Inc., 76 N.J. 152, 184-85, 386 A.2d 816 (1978), overruled in part by Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 406 A.2d 140 (1979)(holding contributory negligence entirely inapplicable to most workplace injuries), the Court adopted a rule on contributory negligence in strict liability suits which it declared was consistent with the "broad consensus of American decisional law and writing in the strict liability field ... expressed by Comment n, Rest.2d Sec. 402A," which the Court quoted as follows:
Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.
[Cepeda, supra, at 185, 386 A.2d 816, quoting Restatement of Torts (Second), Comment n to § 402A.]
The Cepeda Court offered the following explanation for rejecting ordinary contributory negligence as a defense to a strict liability claim:
[I]t is implicit in Comment n and the generality of the cases that only a limited range of a plaintiff's conduct  not contributory negligence in the sense of mere carelessness or inadvertence  can be a defense to an action for strict liability in tort for injuries sustained as the result of a product defect, particularly if the defect is one of unsafe design. [Citations omitted.] We agree with the statement in [Williams v. Brown Manufacturing Company, 45 Ill.2d 418, 261 N.E.2d 305 (1970)] that acceptance of "ordinary" contributory negligence as a defense in actions for strict liability in tort would be incompatible with the policy considerations which led to the adoption of strict tort liability in the first instance. 261 N.E.2d at 310. The manufacturer's duty is imposed precisely to avert foreseeable inadvertent injury to a user of a product.
[Cepeda, 76 N.J. at 185-86, 386 A.2d 816.]
Suter, overruling Cepeda in part, held that no category of contributory or comparative negligence is a defense to strict *76 liability claims for most workplace injuries. The Suter Court compared the facts of the two cases to explain the policy reasons for its decision. The Court's discussion of these facts helps to clarify the kinds of conduct and the mental state that the Court considered would distinguish "ordinary negligence"  which is not a defense to a strict liability claim for injuries sustained in any setting  with "voluntarily and unreasonably proceeding to encounter a known danger"  which is a defense to strict liability claims arising outside the workplace.
The plaintiff in Cepeda, an eighteen-year-old immigrant who had only a second-grade education, was working under the supervision of a foreman, operating a machine that cut plastic into pellets. The machine was defective because it lacked a device to prevent it from starting while a finger-guard was removed. Plaintiff's hand was injured when it was caught in the unguarded machine. The Court held that he "could be barred from recovery because at the time he knew a guard device which would have prevented the accident was missing." Suter, 81 N.J. at 165, 406 A.2d 140. The case was remanded "for a new trial on a theory of contributory negligence to consider whether plaintiff had unreasonably and voluntarily subjected himself to a known danger by operating the machine without the guard on it." Id.
The plaintiff in Suter was the person in charge of the factory where he was injured. He was "completely conversant with every aspect of the equipment." He had purchased the defective machine which mangled his hand. His hand was caught because he carelessly activated the machine by inadvertently pushing a lever that was defective because there was no safeguard to prevent moving it unintentionally. According to the Suter majority, despite plaintiff's knowledge that the machine could be deactivated by pushing a button or stepping on a treadle and that the lever could be avoided by walking a few steps to the side, "under the Cepeda doctrine"  applying contributory negligence to claims for workplace injuries  "as a matter of law, he would not be guilty of contributory negligence" unless, as the Court noted in a footnote, *77 the Suter plaintiff's complete familiarity with the operation of the machine was considered evidence that he had "voluntarily and unreasonably exposed himself to the hazard." Suter, supra, 81 N.J. at 165-66 & n. 4, 406 A.2d 140.
The implication of the court's discussion of the facts of Cepeda and Suter is that in the category of cases where contributory negligence is a defense to strict liability, sustaining that defense requires proof that before plaintiff's injury he was consciously aware of the specific danger that injured him and, with that knowledge, voluntarily exposed himself to the danger. Justice Clifford's concurring opinion in Suter makes that point more explicitly:
It is desirable to emphasize an important feature of this affirmative defense, namely, its requirement of a subjective analysis of the plaintiff's conduct. Was plaintiff actually aware of the danger posed by the product? Did plaintiff in fact see, know, understand and appreciate the danger, and nevertheless make a conscious decision to proceed in the face of it? Did occupational duress or common inadvertence color plaintiff's capacity to appreciate or avoid that risk of danger? [Citations omitted.] These and other questions pertaining to an affirmative defense based on unreasonable, voluntary self-exposure to a known product hazard ... should be charged only in those cases where the trial court is satisfied that evidence exists which would indicate a plaintiff's actual knowledge of the product's danger and, further, his unreasonable and voluntary encountering of this harm.
[Suter, 81 N.J. at 197, 406 A.2d 140 (Clifford J., concurring).]
In Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 410 A.2d 674 (1980), the owner of a fast-food restaurant damaged by fire sued the seller and manufacturer of fire extinguishing equipment which failed to operate. His claim was that the design of the fire extinguisher was defective. The manufacturer asserted that the restaurant owner was contributorily negligent because he had left the restaurant kitchen unattended, stacked paper plates near the grill, and permitted grease to collect on the walls. The jury found that the seller's negligence, a defect in the design of the product for which the manufacturer was responsible, and the restaurant owner's contributory negligence were all proximate causes of the fire damage. Holding that the defense of comparative negligence was inapplicable to plaintiff's strict liability claim, the Court stated:

*78 [T]he type of conduct which will bar recovery in strict product liability has been sharply circumscribed. In such actions a defendant must show that the plaintiff with actual knowledge of the danger posed by the defective product voluntarily and unreasonably encountered that risk.... Plaintiff had no forewarning that the system whose purpose was to extinguish fires, irrespective of cause, would fail to function as a consequence of a design defect. [Emphasis added.]
[Id. at 562-63, 410 A.2d 674.]
In Crumb v. Black & Decker (U.S., Inc.), 204 N.J. Super. 521, 530, 499 A.2d 530 (App.Div. 1985), appeal dismissed, 104 N.J. 432, 517 A.2d 425 (1986), we held that the plaintiff's negligently sitting cross-legged on the ground while he used defendant's saw to cut branches was not a defense to a claim that the saw's protective guard had been negligently designed. We stated:
[W]e must examine the particular risk that plaintiff is claimed to have assumed. In Cartel Capital Corp. v. Fireco of N.J., supra, ... [t]he Supreme Court pointed out that although the employees voluntarily encountered the known risk that the plates would burn, "[p]laintiff had no forewarning that the system whose purpose was to extinguish fires, irrespective of cause, would fail to function as a consequence of a design defect." 81 N.J. at 563 [410 A.2d 674]. So too in our case. Plaintiff, although sitting cross-legged and exposing himself to a danger of being injured by the saw, had no knowledge that the safety guard would fail to operate by reason of the design defect established by the jury. The defendant, therefore, failed to show that plaintiff had "actual knowledge of the danger posed by the defective product," and then "voluntarily and unreasonably encountered that risk." Cartel Capital Corp., 81 N.J. at 562-563, 410 A.2d 674.
In strict liability cases in which New Jersey Courts have ruled that a contributory negligence defense was applicable, they did so because they concluded that there was evidence from which the jury could find that the plaintiff was aware of, and voluntarily encountered, the precise risk which resulted in his injury. For example, in Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 212 A.2d 769 (1965), the plaintiff was injured because of the faulty brakes of the truck in which he was riding; however, he had known for several days that the brakes were gravely defective, he had not reported or taken any other steps to cure the defect, and he continued to ride in the truck. See also Dixon v. Jacobsen Mfg. Co., 270 N.J. Super. 569, 592, 637 A.2d 915 (App. Div.), certif. denied, 136 N.J. 295, 642 A.2d 1004 (1994) (contributory negligence issue properly submitted to jury where sufficient evidence existed for jury to find plaintiff was aware of and *79 voluntarily encountered risk of injury); Ladner v. Mercedes-Benz, 266 N.J. Super. 481, 630 A.2d 308 (App.Div. 1993), certif. denied, 135 N.J. 302, 639 A.2d 301 (1994) (same).
The rule which we draw from these cases was articulated in Novak v. Navistar Intern. Transp. Corp., 46 F.3d 844 (8th Cir.1995), a farmer's strict liability action against the manufacturer of a tractor for injuries he sustained when the tractor ran over him as he was jump starting it while standing in front of one of its rear wheels. Applying South Dakota law, which, like New Jersey's is based on Comment n to Restatement of Torts (Second) § 402A, the United States Court of Appeals held that in a "strict product liability action an assumption of the risk defense" requires a "specific awareness of the dangerous defect which actually causes the accident" and not simply "knowledge by the product user that he has entered a zone of potential danger". 45 F.3d at 849. Consistently with that rule, we hold that in the present case, defendants are entitled to prevail on the defense of comparative negligence only if the jury, after proper instructions, finds that plaintiff was consciously aware that using Combat Room Fogger threatened him with injury by fire when he reentered his kitchen to adjust one of the cans. Awareness that reentering the room posed some other danger, for example because of the product's toxicity, would not justify a finding that he was contributorily negligent. The alleged defect in defendants' product is its flammability; their liability is predicated on their failure to use what the jury found was a feasible means to make it less susceptible of ignition. That basis for liability is inconsistent with a rule that would permit holding plaintiff comparatively negligent for any reason other than his conscious, voluntary assumption of the risk of injury by fire. The jury should have been instructed in accordance with Model Jury Charges  Civil, § 5.34H (4th ed. 1992) that for the plaintiff to be found comparatively negligent, "defendant[s] must prove that plaintiff had actual knowledge of the particular danger and knowingly and voluntarily encountered that risk...."
*80 There was some evidence in the present case that plaintiff was aware of the danger that Combat Room Fogger could ignite or burn, although he denied any such knowledge. The label, which he admitted having carefully read, warned users not to store the product near heat or open flame and to extinguish all flames and pilot lights before using it. The admonition against storage near heat or open flame might be understood as a warning either of flammability or of the possibility that the pressurized can could explode. But the warning to extinguish flames and pilot lights suggests the danger of flammability. On the other hand, the label contained no express warning of the danger of fire or explosion. We have held that federal law prevents plaintiff from predicating his damage claim on this or any other inadequacy of the label. But federal law does not require a court or jury to draw the inference, which would be contrary to fact, that the Combat Room Fogger label communicated the flammability of the product with the same clarity as if it bore a clear and prominent express warning of flammability. On the basis of the facts of this case, the issue whether the information on the product label, or any other facts, had made plaintiff cognizant of the danger that the product would ignite if exposed to flame was a question for an appropriately instructed jury. A new trial is required to determine the extent, if any, of plaintiff's comparative negligence.
The trial court's entire charge on damages reads as follows:
[N]ow, with respect to damages, if the plaintiff prevails he is entitled to recover for the following things. He is entitled to recover for pain and suffering and I'm not going to attempt to tell you what pain and suffering is because we have all experienced it. He is entitled to recover for pain and suffering and all its aspects, physical, emotional, psychological, impairment of enjoyment of life and for that he is entitled to recover such sum of money as reasonable men and women consider adequate to compensate him therefore.
He is also entitled to recover for temporary disability and what temporary disability means is exactly what the words signify, a disability which is temporary in nature which is alleviated by the passage of time or by treatment and he is entitled to recover also for permanent disability, that is disability which is permanent in nature and I tell you a scar is permanent disability.

*81 Now, for temporary disability and permanent disability he is entitled to recover such sum of money as reasonable men and women consider adequate to compensate him therefore.
Now, with respect to these matters, I call to your attention two factors. One, Mr. Lewis' life expectancy. He's 49 years old. According to the actuarial tables he has a life expectancy of 29.79 years. That, of course, doesn't mean that everybody's who's 49 will live 29  28  did I say 29 or 28  it's 28.79. That everybody who is 49 will live 28.79 years, obviously some will and some won't, but this is an actuarial figure which you have a right to take into account in computing his damages if you get to that point.
The other thing I wanted to call to your attention is that an award in a case of this kind is not taxable under either state or federal income taxes. It's exempt from taxation.
Plaintiff objected that the court had deviated from the model charge on damages, but the judge ruled that his deviations were immaterial. We disagree. The court's instructions did not adequately focus the attention of the jury on plaintiff's possible future damages and was "clearly capable of producing an unjust result." R. 2:10-2.
We therefore remand the case for a retrial solely on the issue of comparative negligence and on the quantum of damages. The jury's verdict on liability will remain undisturbed.
NOTES
[1] United Industries Corporation has appeared in the place of Realex Chemical Corporation and Chemsico Incorporated in this action. Realex Chemical was merged into United Industries on February 15, 1990 and no longer exists as a separate entity. Chemsico is an unincorporated division of United Industries with no separate corporate existence.
[2] Plaintiff points out that use of P-22 was banned because it is thought to cause depletion of the stratospheric ozone layer, not because it causes birth defects.